FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KRISTOPHER C. EDWARDS,
*Petitioner-Appellee,*

v.

A. LAMARQUE, Warden,
*Respondent-Appellant.*

No. 04-55752

D.C. No.
CV-01-10401-RGK

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted En Banc
October 5, 2006—San Francisco, California

Filed February 1, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Betty B. Fletcher, Harry Pregerson, Alex Kozinski,
Pamela Ann Rymer, Andrew J. Kleinfeld,
Michael Daly Hawkins, Susan P. Graber,
Raymond C. Fisher, Richard A. Paez, Richard C. Tallman,
Johnnie B. Rawlinson, Richard R. Clifton, Jay S. Bybee, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Hawkins;
Concurrence by Judge Graber;
Dissent by Judge Fisher

## COUNSEL

David C. Cook, Deputy Attorney General, Office of the Attorney General of the State of California, Los Angeles, California, for the respondent-appellant.

Steven S. Lubliner, Law Offices of Steven S. Lubliner, Petaluma, California, for the petitioner-appellee.

## OPINION

HAWKINS, Circuit Judge:

Petitioner-appellee Kristopher C. Edwards was convicted of murder in state court and sentenced to life in prison without possibility of parole. The district court granted his § 2254 habeas petition, finding that Edwards's trial attorney had mistakenly caused Edwards to waive his marital privilege and that this constituted prejudicial error entitling Edwards to relief for ineffective assistance of counsel. The state appealed, and a divided panel of this court affirmed, *Edwards v. LaMarque*, 439 F.3d 504 (9th Cir. 2005); we granted rehearing en banc, 455 F.3d 973 (9th Cir. 2006), and now reverse.

## FACTS AND PROCEDURAL BACKGROUND

This case involves something of a murder mystery about which there is little mystery. In 1996, based on information obtained from Edwards's wife, Kemet Gaines, Edwards was arrested and charged with first degree murder, insurance fraud, and conspiracy to commit insurance fraud. Before trial, and in anticipation of Gaines's testimony, Edwards's counsel John Meyers raised the issue of marital privilege under California Evidence Code § 980. The trial court ruled that although Gaines could testify about her observations of Edwards's behavior around the time of the murder, she could

not specifically testify about conversations between them because of the privilege.

At trial, the prosecution's evidence showed that, at some time in 1990, Edwards and the victim, Don Thomas, conspired to defraud Edwards's automobile insurance company. Thomas took Edwards's Mercedes Benz, stripped parts from the car, and then abandoned it. Edwards reported the car as stolen and filed an insurance claim. According to their plan, once the Mercedes was "recovered," they would then replace the parts and Edwards would pay Thomas for his participation. The scheme went awry, however, because Thomas stripped too many parts and the insurance company "totaled" the car, resulting in a smaller payout and loss of the car.

Thomas and Edwards exchanged threats and angry phone calls in the spring of 1991. In mid-July, Edwards received a check for $3,267.86 from his insurance company and deposited it in his bank. Edwards testified that on the evening of July 16, he telephoned Thomas and told him he could come either to Edwards's house or to the barbershop where Edwards worked to get his money, but that Thomas never showed up.

The next evening, Thomas's body was found in the alley behind the barbershop. Thomas had been shot with both a 9 millimeter and a .38 caliber handgun. Ballistics evidence revealed that the 9 millimeter bullets retrieved from the murder scene had been fired from a 9 millimeter weapon registered to Edwards's wife. His wife was also the registered owner of a .38 caliber handgun, but this gun was unavailable for testing at the time of Edwards's trial. However, the bullet retrieved from Thomas was consistent with being fired from the type of .38 handgun registered to Gaines. Gaines testified that she had purchased these weapons for Edwards at his request because (as a convicted felon) he could not purchase them himself.

Gaines testified that on the evening Thomas was murdered, she had gone to visit her brother and returned home to find Edwards acting nervous and jittery. She also indicated he was scrubbing his hands with laundry detergent. During cross-examination, Meyers asked Gaines what reason Edwards had offered for washing his hands. The prosecutor objected and at a sidebar argued that Meyers was asking about confidential communications and that Edwards would be waiving the marital privilege if he continued. Meyers withdrew the question.

Gaines continued to testify that, the following evening, Edwards received a phone call and then grabbed a shotgun, started looking out the window, and eventually took her to a nearby motel for the night. The next day, the couple left for Florida, where they stayed a few days, and then they resettled in Michigan. Some eight months later, Gaines left Edwards and returned to Los Angeles. Located by police following her return, Gaines provided information that led to Edwards's arrest. Gaines was given immunity from prosecution in exchange for her testimony against Edwards.

Thomas's cousin, Tyrone Melton, also testified for the prosecution. After learning of Thomas's death, Melton called Edwards to accuse him of the murder. Thomas testified that Edwards threatened, "I'll fuck you up too," thus implicitly admitting to killing Thomas.

In the face of this evidence, Edwards chose to take the stand and tell his side of the story. Edwards testified that he had agreed to pay Thomas $1,500 for his role in the insurance fraud, and that he had given Thomas the two handguns owned by Gaines to keep as collateral. If Thomas wanted to keep the guns, then Edwards would pay him only $1,000 instead.

Edwards claimed he was home alone at the time of the murder. He testified that one of his puppies had an accident on the carpet and that he had cleaned it up and that was why he was washing his hands with detergent when his wife

returned home. Meyers asked Edwards, "Did you tell her what had happened with the dog?" Edwards answered, "About the dogs, yes."

Edwards confirmed that he had received a call from Thomas's cousin Melton, accusing Edwards of killing Thomas. According to Edwards, that same day, an anonymous caller threatened: "You and that bitch are dead. We know where you're at and we know where you live." At this point, Edwards turned off the lights, loaded a shotgun, and stood by the window. Edwards said his wife started hollering "What's going on? What's happening? What's wrong?" Meyers asked Edwards, "Did you tell her anything?" Edwards replied, "I told her 'Somebody killed Don [Thomas] and they think I had something to do with it, and they just threatened to come and kill us.'"

The prosecutor objected and called for a sidebar, arguing that Edwards had waived the marital communications privilege by this testimony. Meyers argued that not every marital conversation is privileged, and also argued vigorously that even if Edwards had waived the privilege regarding the conversation on the second night about the phone call, this waiver did not extend to other conversations that had occurred earlier between Edwards and his wife. The following morning, the court revisited the issue and indicated that it believed under *People v. Worthington*, 113 Cal. Rptr. 322 (Ct. App. 1974), Edwards no longer had an expectation of privacy in the conversations with his wife about the murder. Meyers attempted to distinguish *Worthington* and again argued that any waiver was only with respect to a single conversation and should not be construed as a broad waiver, but the court disagreed.

Almost immediately, Meyers stated that the court's ruling raised a significant ineffective assistance of counsel claim for appeal. The court again disagreed with Meyers:

> The Court:  Well I don't agree. I don't think it's inadequate representation. He chose to

> take the stand and he wanted to tell his version. And the only way he can tell his version is to tell it as he has told it.
>
> And I think it's a tactical decision. Maybe you didn't anticipate it was breaching the privilege, but I don't see that as —

Meyers: It wasn't a tactic. It was a mistake.

The Court: I don't see it as ineffective assistance.

The prosecution called Gaines again in rebuttal. This time she testified that Edwards had told her to visit her brother on the night of the murder, and that she thought this was "very odd" because he usually did not encourage her to spend time with her family. She also testified that when she returned home and saw him scrubbing his hands, she asked him what he had done. At first, Edwards did not reply, and then Gaines asked him whether he had killed Thomas. According to Gaines, Edwards replied, "I'll put it to you like this: you don't have to worry about hearing from him again." On cross-examination, Meyers brought out the point that the couple did have a young puppy in July 1991 and that Gaines had failed to mention Edwards's supposed confession in her first interview with the police.

At the end of the first trial, the jury convicted Edwards of the insurance fraud counts, but deadlocked on the murder charge.[1] A different attorney represented Edwards in the retrial on the murder charge. Following new argument about the waiver issue, the second trial court ruled that the waiver of marital privilege would apply to the retrial and agreed with

---

[1] We can only speculate why this happened, but it appears that there was some racial animosity between the jurors, which may have led one juror to become a holdout vote for acquittal.

the first trial court that Meyers made a tactical decision to ask the questions that led to waiver, and that Meyers was not ineffective for doing so. The court similarly denied a midtrial motion for mistrial. This time, the jury convicted Edwards of the murder. The court also denied Edwards's post-conviction motion for a new trial, which again asserted ineffective assistance of counsel with respect to Meyers's actions that waived the privilege.

On direct appeal, Edwards argued that the trial court erroneously found that the marital privilege was waived, that the waiver was limited in scope, and that Meyers had rendered ineffective assistance of counsel. The California Court of Appeal held that the first trial court had properly found that the privilege had been waived. It also rejected Edwards's claim of ineffective assistance. The court stated:

> The trial court also properly determined that eliciting appellant's testimony about his version of that conversation did not constitute ineffective assistance of counsel. To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for counsel's deficient performance, the defendant would have obtained a more favorable outcome. In determining whether counsel's performance was deficient, a court must generally exercise deferential scrutiny, viewing the reasonableness of counsel's acts under the circumstances as they stood at the time counsel acted and should not second-guess reasonable tactical decisions. The trial court need not accept a self-proclaimed assertion by trial counsel that trial counsel's performance was inadequate.
>
> In view of the strong evidence against appellant, defense counsel could reasonably have decided to

introduce appellant's testimony regarding his version of the conversation he had with Gaines on the night of July 17, 1991. In fact, as previously noted, the first jury deadlocked on the murder charge. Since defense counsel was aware that the trial court had ruled that defense counsel could not introduce evidence of the defense's version of a conversation between appellant and Gaines without opening the door to the prosecution's version of that conversation, the trial court reasonably determined that eliciting appellant's testimony regarding his conversation with Gaines on the night of July 17, 1991, was a reasonable tactical decision rather than ineffective assistance of counsel.

(citations omitted).

Edwards filed a petition for review in the California Supreme Court, but received a postcard denial. Edwards then filed his habeas petition in the district court in December 2001, alleging, among other claims, that Meyers provided ineffective assistance. A magistrate judge issued a report and recommendation, recommending that the district court grant the petition on the ineffective assistance of counsel claim. The magistrate judge concluded that the state court determination that Meyers had made a tactical decision was objectively unreasonable in light of the facts before it. The magistrate judge also concluded that even if a tactical decision, it was not a reasonable one, and also found that Edwards had been prejudiced by this error. The district court adopted the report and recommendation and granted Edwards's petition, and this appeal followed.

## DISCUSSION

### I

Edwards's appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254, which significantly constrains our review of state court proceedings. We may not grant a writ of habeas corpus on behalf of a person in state custody unless the state's adjudication of his claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

The Supreme Court instructs that, in determining whether a state court's application of law or factual determination is "unreasonable," we cannot simply consider whether we would have reached a different outcome on the same record. *Rice v. Collins*, 126 S. Ct. 969, 976 (2006) (stating that "[r]easonable minds reviewing the record might disagree about" the ultimate issue is insufficient for habeas relief). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Only if the evidence is "too powerful to conclude anything but" the contrary should we grant relief. *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).

**[1]** Because this case involves a claim of ineffective assistance of counsel, there is an additional layer of deference to the choices of trial counsel. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (internal quotation marks omitted). To prevail on a claim of ineffective assistance, a petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," *id.* at 687, and that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

II

A

We begin by considering the state court's determination that Meyers made a tactical decision to ask the questions which led Edwards to waive the marital privilege. We must apply AEDPA's standards to the state court's "last reasoned decision" on the claim, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991), which in this case was the opinion of the California Court of Appeal. Although "AEDPA generally requires federal courts to review one state decision," if the last reasoned decision adopts or substantially incorporates the reasoning from a previous state court decision, we may consider both decisions to "fully ascertain the reasoning of the last decision." *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 2041 (2006). In ruling on Edwards's ineffective assistance of counsel claim, the California Court of Appeal refers back to and incorporates the reasoning of the first trial court to conclude that Meyers made a reasonable tactical decision.

**[2]** Although the *reasonableness* of counsel's decision is best described as a question of law, whether Meyers's actions were indeed "tactical" is a question of fact. *See, e.g.*, *Holsomback v. White*, 133 F.3d 1382, 1386-87 (11th Cir. 1998); *Berryman v. Morton*, 100 F.3d 1089, 1095 (3d Cir. 1996). Therefore, we must initially decide whether the state court made an unreasonable determination of the facts in light of the evidence before it. *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004).

**[3]** We recognize that Meyers himself quickly claimed he made a mistake, rather than a tactical decision. As the California Court of Appeal noted, however, the trial court was not

obligated to "accept a self-proclaimed assertion by trial counsel" of inadequate performance. The trial court judge, who was in a unique position to observe Meyers's actions throughout the trial, rejected this assertion and the California Court of Appeal deferred to that determination.[2] We do the same. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (holding that federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them").

We are also aware that there are portions of the record where Meyers appeared to misunderstand the marital privilege. However, midtrial the court clearly advised Meyers that he could not characterize certain conversations as nonconfidential and thereby preclude the government from introducing Gaines's differing version of the same conversation. Meyers heeded this warning and withdrew a question to Gaines during his cross-examination. This sequence of events supports the trial court's rejection of Meyers's claim of mistake, which occurred shortly thereafter.

[4] We might reach a different conclusion on the cold record if we were reviewing de novo. But that is not our task. *See McClure v. Thompson*, 323 F.3d 1233, 1243-44 (9th Cir. 2003) (holding that state court findings of fact are entitled to deference even though evidence may cast doubt on findings such that federal court would have made different findings of fact). The trial court judge who had observed Meyers throughout the trial readily dismissed Meyers's assertion that he had made a mistake. It was Meyers who raised the issue of spousal privilege pretrial and obtained a favorable ruling for his client. Even though during trial it may have appeared that

---

[2]Although the California Court of Appeal did not rely on the determination of the second trial court on this issue, we share that court's skepticism of Meyers's mea culpa: "Well, that's a nice way to try to protect your client, but I'm not sure that that's—that's a real admission of incompetence of counsel."

Meyers did not fully comprehend the scope of that ruling, the consequences of inquiring into spousal communications was clearly brought into focus by the court during Gaines's cross-examination. With full knowledge of this, Meyers still had Edwards testify to his version of events, including the explanations he made to his wife. Meyers may have hoped that he could "get by" with this line of questioning without waiving the privilege, or at least without waiving it as to all communications, but it was not objectively unreasonable for the trial court and the California Court of Appeal to conclude on the facts before them that Meyers intentionally asked those questions of Edwards as part of his trial tactics.

B

Our conclusion, of course, raises the question of whether Meyers's tactics were reasonable. In evaluating the reasonableness of counsel's actions, a reviewing court must consider the circumstances at the time of counsel's conduct, *Strickland*, 466 U.S. at 690, and cannot "second-guess" counsel's decisions or view them under the "fabled twenty-twenty vision of hindsight," *LaGrand v. Stewart*, 133 F.3d 1253, 1271 (9th Cir. 1998) (internal quotation marks omitted).

As the California Court of Appeal recognized, Meyers was confronted with a strong case against his client. If Edwards did not testify, the jury would be left with no explanation for the prosecution's evidence, including the bizarre conduct his wife observed around the time of the murder — the hand washing, the pacing with the shotgun, the sudden out-of-state departure, etc. The district court, however, reasoned that Edwards could have presented his explanation for these events — the dog mess and the anonymous threatening phone call — without going into confidential communications with Gaines and thus had nothing to gain by risking waiver of the marital privilege.

This reasoning, however, goes only so far. Having already heard Gaines testify about her observations — including how

strange she considered Edwards's behavior — the jury was left to speculate whether Edwards had even attempted to explain his actions to his wife or whether he simply let her think he was a murderer. After all, would not a truly innocent man have justified his behavior to his wife? Moreover, without Edwards's testimony that he had conveyed the caller's threat — which was supposedly directed at both Edwards and his wife — to Gaines, there was no innocent explanation for her decision to accompany him on their cross-country trek. The couple's sudden flight was one of the most damaging pieces of the prosecution's case, and Edwards certainly did not want the jury to have the impression that his wife accompanied him out of fear of him as a murderer, as opposed to fear of a third party.

[5] Moreover, the district court's conclusion that Meyers's conduct was unreasonable presumes that the finding of waiver of the marital privilege was a foregone conclusion. Meyers, however, argued forcefully that he could question Edwards about his conversation with Gaines on the night after the murder without opening the door to different conversations with her the night before. Although his argument did not prevail, it was not an unreasonable argument in light of California law at the time. The primary case relied on by the trial court, *People v. Worthington*, 113 Cal. Rptr. 322 (Ct. App. 1974), involved dueling versions of a single conversation. Other California cases suggested that waiver of privilege was limited and that a disclosure would waive the privilege only if it amounts to a "significant part" of the confidential communication. *See, e.g.*, *Owens v. Palos Verdes Monaco*, 191 Cal. Rptr. 381, 390 (Ct. App. 1983) ("[A] waiver under Evidence Code section 912 relates to the particular communication which has been revealed and not to all communications concerning the subject matter of the lawsuit."), *disapproved on other grounds by Applied Equip. Corp. v. Litton Saudi Arabia, Ltd.*, 869 P.2d 454, 464 n.10 (Cal. 1994). Indeed, this very argument about the limited scope of the waiver was

repeated by Edwards's second trial counsel and again on appeal.

Finally, an additional factor that must be weighed in evaluating the risks and benefits at the time of Meyers's decision is how devastating the downside would be if the court did find waiver as to all spousal communications. Meyers knew from one of the police reports that Gaines claimed Edwards had confessed to her on the night of the murder. Meyers also knew, however, that he could impeach Gaines's credibility with not only her grant of immunity from prosecution, but also with her omission of this obviously critical information from her first interview with police (even though she had given them other information pointing toward Edwards as the murderer). In the end, in a worst-case scenario, Meyers would wind up with a "he said, she said" credibility battle, but it might be his client's only hope for acquittal.

Meyers's decision to ask Edwards about conversations with his wife was certainly risky and may not have turned out the way he had hoped. But there are many different reasonable ways to try a case and, in Meyers's mind, desperate times may have called for desperate measures. The California Court of Appeal recognized this as well, concluding in light of the "strong evidence" against Edwards that Meyers's decision was reasonable and did not amount to ineffective assistance. Giving proper deference to this state court conclusion, and even though we might reach a different conclusion under a different standard of review, we cannot say that this determination was an objectively unreasonable application of *Strickland* to the facts of this case.[3]

---

[3]Because of our determination, we need not reach the prejudice prong of *Strickland*. We do, however, agree with the California Court of Appeal that there was strong evidence against Edwards even without his wife's testimony. Gaines's testimony about Edwards's confession, although damaging, was not the piece of evidence that tipped an otherwise balanced scale in favor of the prosecution; it was more the bow on top of a nicely wrapped package of motive, means, ballistics evidence, implied confession, and consciousness of guilt.

### III

**[6]** We reverse the district court's habeas grant. The California Court of Appeal was not objectively unreasonable in determining that Edwards's counsel made a reasonable, tactical decision to ask the questions that led to Edwards's waiver of the spousal privilege.

**REVERSED**.

---

GRABER, Circuit Judge, specially concurring:

I concur in the result but not in all of the reasoning of the majority opinion.

I agree with Part II(A) of the dissent, which concludes that Defendant's counsel mistakenly waived Defendant's marital privilege, misunderstood the law, and did not make a "tactical" decision. The state court unreasonably found the decision to have been "tactical."

But, because of our highly deferential standard of review, I agree with Part II(B) of the majority opinion, which holds that the state court permissibly concluded that counsel's performance was not objectively unreasonable under the first prong of *Strickland v. Washington*, 466 U.S. 668 (1984). Not every mistake requires a conclusion that counsel acted outside the bounds of professional competence. Moreover, in my view, for the reasons alluded to in the majority's footnote 3, Defendant did not demonstrate prejudice under the second prong of *Strickland*.

Accordingly, I concur in the result.

FISHER, Circuit Judge, with whom B. FLETCHER, PRE-GERSON, PAEZ and RAWLINSON, Circuit Judges, join in dissent:

The objective record embodied in the trial transcript plainly shows that Edwards' counsel, John Meyers, never understood the California law of marital privilege. In granting the writ, the district judge, himself an experienced former California Superior Court judge, found that Meyers' waiver of Edwards' privilege was neither tactical nor reasonable. Nonetheless, the California Court of Appeal held that Meyers made the tactical decision to intentionally waive Edwards' privilege rights. The majority reads the Court of Appeal's decision as concluding that Meyers simply made a high-risk tactical decision to try to get into evidence one of Edwards' conversations with his wife without opening the door to her damning account of his supposed confession to her. But even if the majority's reading is accurate, tactics based on ignorance cannot be what *Strickland* contemplates as "sound trial strategy," *see Strickland v. Washington*, 466 U.S. 668, 689 (1984); rather it is the essence of attorney incompetence to fail to understand the governing law necessary to formulate such a strategy. The clear record evidence of incompetence here is "too powerful to conclude anything but" that Meyers mistakenly waived Edwards' marital privilege. *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).[1] Moreover, we cannot agree with the dire picture the majority paints to justify Meyers' supposed strategy — that "desperate circumstances require desperate measures." The district court carefully analyzed the trial record in concluding that the benefits of getting Edwards' version of what he said to his wife, Kemet Gaines, about the anonymous caller were dwarfed by the risk of Gaines then being allowed to testify about her highly prejudicial version of the "dog mess" conversation.

---

[1]*See Edwards v. Lamarque*, 439 F.3d 504 (9th Cir. 2005), *vacated*, 455 F.3d 973 (9th Cir. 2006).

We are mindful that AEDPA sets a high standard to allow us to find a state court's application of law or factual determination to be "unreasonable," *see* 28 U.S.C. § 2254(d); *Rice v. Collins*, 126 S. Ct. 969, 976 (2006), and that we must presume an attorney's conduct involved a competent trial strategy, *see Strickland*, 466 U.S. at 689. On this record, however, we conclude that Edwards clears both hurdles. Meyers lacked the legal competence to make such a decision. His inappropriate questions, misinformed legal arguments and the predictable damage resulting from opening the door to his wife's version of their discussion are ample evidence of his incompetence. An attorney cannot make an informed tactical decision to waive a privilege he does not understand. Thus it was objectively unreasonable for the California Court of Appeal to find Meyers effective here. Because Edwards was prejudiced by his counsel's deficient representation, we would affirm the district court's grant of Edwards' habeas petition. We therefore respectfully dissent.

## I.   Facts

The majority's summary of the facts understates the extent to which Meyers lacked a basic understanding of the law of privilege and waiver, as evidenced by the trial transcript. Meyers failed to understand the law governing marital privilege, not just at the beginning of trial but throughout. He never shook his misperception that he could pick and choose parts of sensitive communications between Edwards and Gaines without waiving the privilege, even when warned by both the prosecutor and the trial judge. His misunderstanding led directly to his waiver of Edwards' rights.

Meyers knew before trial that Edwards' wife had told police that she was prepared to testify that during the exchange with Edwards on July 17 about why he was washing his hands, he had confessed to murdering Don Thomas. In anticipation of Gaines' testimony, Meyers raised the issue of marital privilege, obtaining a trial court ruling in limine that

Gaines could testify only about discussions between her and Edwards regarding the insurance fraud scheme, and about her observations of Edwards' behavior on the nights in question.

Nonetheless, Meyers proceeded nearly to fumble away the benefit of this limiting order by asking Gaines what reason Edwards had given for washing his hands on July 17, the night of the murder. Responding to an objection from the prosecution that Meyers was getting into privileged territory, Meyers asserted at sidebar that the conversation about Edwards' washing his hands was "not a confidential communication." Meyers argued that some conversations between Edwards and Gaines were confidential, but others were not. Astonishingly, Meyers also argued that he could ask Gaines about communications with Edwards because she had waived her marital privilege by taking the stand. Meyers mistakenly believed that because Gaines was not asserting *her* marital privilege, he could ask her about confidential communications with Edwards without waiving *Edwards'* privilege.

The trial judge attempted to clarify waiver law for Meyers, explaining that other than statements made in furtherance of the insurance fraud crime, "any statements that are made are . . . confidential because they are between a husband and a wife." *Accord North v. Superior Court of Riverside County*, 8 Cal. 3d 301, 310 (Cal. 1972) (holding that all statements made between husband and wife are presumed confidential). The court also informed Meyers that he could not "character-ize certain conversations as [not] confidential because [Edwards and Gaines] might happen to be talking about the dog. They are still confidential." Meyers responded, "That's a pretty good issue," and withdrew the question.

Despite the trial court's lesson in evidence law, Meyers continued to blunder. During his direct examination of Edwards, Meyers asked about the evening of July 18 when Edwards received a death threat over the telephone from the victim's cousin, Tyrone Melton. Specifically, Meyers asked

Edwards whether he told Gaines anything about the phone call. Edwards responded, "I told her, 'Somebody killed Don and they think I had something to do with it, and they just threatened to come and kill us.' " After another objection from the prosecution, the court told Meyers that he had allowed Edwards to waive the marital privilege by "testify-[ing] to what [Edwards] told [Gaines]." Meyers objected, contending once again that "every statement made between a husband and wife is not a confidentiality privilege" and that Edwards had not waived the privilege because any communication between Edwards and Gaines regarding the phone call "wasn't confidential." When told by the court that Edwards could not "pick and choose" which conversations were confidential and which were not, Meyers replied, "Sure you can." Obviously, the court's prior explanation that all communications between husband and wife are presumed confidential had been lost on Meyers.

The court gave Meyers the opportunity to come in the next morning and provide some authorities for his proposition that Edwards could designate certain conversations confidential and others not confidential. Significantly, Meyers returned empty-handed, and was forced on the spot to read and respond to the key California case — *People v. Worthington*, 38 Cal. App. 3d 359 (Ct. App. 1974) — which was new to him. Meyers' extemporaneous riff on *Worthington* predictably did not persuade the judge, who ruled that Edwards' marital privilege indeed had been waived. Meyers immediately responded, "Well, one thing for the record, that raises a significant [ineffective assistance of counsel] claim if he is convicted on appeal, in my judgment. ¶ [W]hat you're saying is I erred in asking that question and I, quote, opened the door, close quote, to all the other stuff coming in. To me, that's inadequate representation of counsel." The trial court disagreed, finding that it was a "tactical decision," although adding that "[m]aybe you didn't anticipate it was breaching

the privilege . . . ." Meyers responded, "It wasn't a tactic. It was a mistake."[2]

## II.  Discussion

### A.  Meyers Mistakenly Waived Edwards' Privilege

The district court correctly rejected the California Court of Appeal's finding that Meyers' acts reflected "tactical" decisions. The Court of Appeal reasoned that:

> In view of the strong evidence against appellant, defense counsel could reasonably have decided to introduce appellant's testimony regarding his version of the conversation he had with Gaines on the night of July 17, 1991. In fact, as previously noted, the first jury deadlocked on the murder charge. *Since defense counsel was aware that the trial court had ruled that defense counsel could not introduce evidence of the defense's version of a conversation between appellant and Gaines without opening the door to the prosecution's version of that conversation*, the trial court reasonably determined that *eliciting appellant's testimony regarding his conversation with Gaines on the night of July 17, 1991, was a reasonable tactical decision* rather than ineffective assistance of counsel.

(Emphasis added.)

In essence, the court assumed that Meyers deliberately decided to open the door to Gaines' confession testimony, notwithstanding his earlier efforts to keep her testimony out and despite his articulated misunderstanding of the all-or-nothing character of the privilege. Such a high risk, self-

---

[2] We agree with the majority that Meyers' mea culpa claiming mistake is not dispositive. (Op. at 1177-78.)

destructive defense strategy seems implausible on its face. As
borne out by the transcript, and by the obviously devastating
impact on Edwards' defense of letting Gaines testify that he
had essentially admitted to having killed Don Thomas, the
Court of Appeal's reading of the record is not just implausible
but objectively unreasonable.

The majority, which apparently does not want to defend the
Court of Appeal's decision as written, acknowledges that
Meyers at least initially "appeared to misunderstand the mari-
tal privilege," (Op. at 1178), but posits that Meyers — warned
by the trial court that he could not ask about parts of Edwards'
conversations with his wife — then made the tactical decision
to ask the questions that led Edwards to waive the marital
privilege, perhaps hoping he could "get by" without actually
opening the door to Gaines' damaging testimony. (Op. at
1179.) The record simply does not bear out such a knowl-
edgeable strategy. Rather it shows that Meyers persisted in
thinking he could ask about one interchange between the hus-
band and wife without opening up their broader communica-
tions about the events of July 1991. Even the trial judge in
calling Meyers' questioning "tactical" acknowledged, "Maybe
you didn't anticipate it was breaching the privilege . . . ." That
observation not only underscores Meyers' legal incompe-
tence, but it gives the lie to the notion that Meyers had delib-
erately decided to waive the privilege.[3]

---

[3]Like the majority, we recognize that the trial judge "had observed
Meyers throughout the trial." (Op. at 1178.) However, given the judge's
seemingly contradictory conclusion that Meyers waived Edwards' rights
as a litigation tactic but may not have known he was doing so, his "tacti-
cal" finding should carry less weight, notwithstanding the deference we
owe the trial judge and the limitations of appellate review from a trial tran-
script. *Cf. Rice v. Collins*, 126 S. Ct. 969, 975-76 (2006) (reviewing credi-
bility findings of state trial court); *see also id.* at 977 (Breyer, J.,
concurring) (reminding that "[t]he trial judge is best placed to consider the
factors that underlie credibility" and that "[a]ppellate judges cannot on the
basis of a cold record easily second-guess a trial judge's decision about
likely motivation" when reviewing *Batson* challenges). The trial judge did

In short, Meyers made no tactical decision to reverse course and let the prosecution put on Gaines' damaging confession testimony. He opened the door by mistake, plain and simple. The Court of Appeal's conclusion that Meyers intended to waive his client's privilege simply is not borne out by the record. Nor is the majority's alternative explanation objectively reasonable. The only "tactical" decision Meyers made was to get in Edwards' statement to Gaines about the anonymous caller's threat, thinking he could limit it to that. A tactical decision with devastating consequences based on a mistake of law is not effective assistance of counsel.

## B. Meyers' Performance was Deficient

Even if the California Court of Appeal reasonably understood Meyers to have made a tactical decision to waive the privilege, the state court unreasonably applied the *Strickland* standard in finding the tactic to be reasonable. By waiving Edwards' marital privilege and exposing him to the devastating impact of a confession for little testimony of value in return, Meyers acted outside the bounds of professional competence. Indeed, the calculus was so one-sided as to reinforce the conclusion that Meyers acted out of ignorance.

In *Strickland*, the Supreme Court held that to prevail on an ineffective assistance claim, a petitioner "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. As the district court properly recognized, the Supreme Court and this circuit have compared

---

not articulate any reasoning that is not captured by the trial transcript — Meyers' demeanor, for example — but rather the judge appears to have accepted, as the majority now does, that it is constitutionally acceptable for an attorney to make a strategic decision based on an erroneous understanding of the law.

the risks and benefits associated with a lawyer's tactical decisions. *See, e.g.*, *Darden v. Wainwright*, 477 U.S. 168, 186 (1986); *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992). If we apply that kind of analysis to Meyers' decision to waive the privilege, the ledger is decidedly one-sided against waiver. By waiving Edwards' marital privilege, Meyers opened the door to testimony from Gaines. Meyers knew that Gaines was openly hostile to Edwards and had told police that he had confessed the murder to her. Not only did Gaines tell the police about his confession, but she told them that "he's crazy," she feared him and he had threatened her. Indeed, it was Gaines who, five years after the murder, tipped off the police that her husband was the murderer. Meyers knew that Gaines was firmly in the prosecution's camp. Balanced against this near-certain and near-dispositive evidence, there was little for Edwards to gain from Gaines' testimony.

The majority speculates that Meyers waived the privilege so that the jury would not be left to wonder whether Edwards attempted to explain his behavior — such as pacing the apartment with a shotgun and washing his hands — to his wife. (Op. at 1180.) But Edwards had already explained his behavior to the jury — without waiving the marital privilege — simply by testifying that Melton had threatened both him and his wife, and by describing his attempt to clean up his dog's mess. The additional question of whether Edwards tried to explain those actions to his wife concerns a minor detail that pales in importance to Gaines' revelation of Edwards' confession.

Similarly, the majority states that without waiver, "there was no innocent explanation for [Gaines'] decision to accompany him on their cross-country trek." (Op. at 1180.) That assertion is perplexing; Edwards testified that Melton had threatened both Edwards and Gaines without waiving the privilege. Such testimony did not require delving into confidential communications between Edwards and Gaines and provided reason enough to explain why Gaines accompanied

Edwards when he fled from the state. The only benefit Edwards could have hoped to receive from waiving the privilege was showing that Gaines *knew* she too had been threatened by the victim's cousin. Once again, we are not persuaded that it was reasonable for Meyers to seek the minimal benefit accorded by this additional fact in exchange for the near-certain revelation of a murder confession.

Nor was Meyers' waiver of Edwards' privilege reasonable even assuming there was a non-frivolous argument that waiver should be limited to conversations that occurred on July 18, the night after Edwards confessed to his wife. (Op. at 1180-81.) That the scope of waiver was unsettled under California law at the time only bolsters my conviction that Meyers' decision to waive was unreasonable. In light of the considerable risk posed by Gaines' testimony, Meyers should not have plowed blindly into protected communications without first attempting to clarify the effect of waiver through a motion in limine.[4]

The majority excuses Meyers' decision to waive the privilege by recalling the adage, "desperate times call for desperate measures." (Op. at 1181.) As a preliminary matter, characterizing Edwards' case as desperate is misleading. All of the evidence linking Edwards to the crime was circumstantial. Although the victim's cousin, Tyrone Melton, testified that Edwards told him, "And I'll fuck you up too," Melton's testimony was ambiguous and weak in comparison to what Gaines would have to say. On cross-examination, Melton's credibility was undermined when he admitted that he personally desired to see Edwards convicted. The defense also brought out that when Melton signed a police statement less than two weeks after the murder, he recounted his phone conversation with Edwards and left out any reference to Edwards' alleged

---

[4]Meyers did not seek a preliminary ruling on the consequences of Edwards testifying about his version of conversations with Gaines or the limits of the testimony he could elicit from Gaines.

self-incriminating statement. At that time — when the conversation with Edwards was freshest in his mind — Melton told the police only that Edwards had denied knowing about the murder of Thomas or who had committed it.

Moreover, the majority's "desperate times" thesis does not excuse ineffective assistance of counsel. As *Strickland* established, even in desperate times, there are discernible limits on counsel's justification for taking unwarranted risks. The decision to waive Edwards' marital privilege falls outside those limits. When the ultimate balance is calculated, the cost of waiving Edwards' marital privilege overwhelmingly outweighs any benefit to Edwards. By waiving Edwards' marital privilege rights, Meyers provided ineffective assistance and the California Court of Appeal was objectively unreasonable in finding otherwise.

### C.   Edwards was Prejudiced by Meyers' Ineffective Assistance

To prevail on a claim of ineffective assistance, Edwards must also show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The second trial judge explicitly found that Edwards was prejudiced by the waiver of his marital privilege, stating that without Gaines' testimony:

> the verdict may well have been a different one. So that I want to make it clear that if I'm wrong on this, I do think it's reversible, from my standpoint, for whatever the court of appeals wants to decide because this is a key issue in this case. This testimony was very damaging.

The trial court's unequivocal assessment of prejudice is entitled to deference under 28 U.S.C. § 2254(d) and was not objectively unreasonable.

When a state trial court reaches a reasoned conclusion that the appellate court subsequently does not address, traditionally we have treated the trial court's determination as the last reasoned decision. *See Hirschfield v. Payne*, 420 F.3d 922, 928 (9th Cir. 2005) (reviewing trial judge's oral decision to deny petitioner's motion to represent himself because state appellate court did not address the ruling). The trial court's finding is the only determination on prejudice in the entire state court record. Affording the state trial court's determination adequate deference under AEDPA, we cannot say that its finding of prejudice was objectively unreasonable. Without the confession, the only evidence linking Edwards to the crime was circumstantial and the impeached testimony from the victim's cousin that Edwards threatened to "fuck you up too." A defendant's own confession is the most damning sort of evidence available against him. *See Bruton v. United States*, 391 U.S. 123, 139-40 (1968) ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him."). Because a confession is so damaging, we are persuaded that under the circumstances, the trial judge reasonably concluded that Edwards was prejudiced by the waiver of his marital privilege.

### III. Conclusion

The California Court of Appeal's conclusion that Meyers made a tactical decision to waive Edwards' marital privilege was objectively unreasonable; the trial transcript makes clear that Meyers did not comprehend the basic legal underpinnings of the law of privilege and waiver and waived Edwards' rights only in error. Moreover, by opening Edwards up to the most damning evidence available for little in return, Meyers rendered ineffective assistance of counsel. The state trial court's finding that there was a reasonable probability that but for Meyers' ineffective assistance, the verdict would have been different was reasonable. We would affirm the district court

and grant the habeas petition. We therefore respectfully dissent.